IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL MCGRAW,<br><br>          Plaintiff,<br><br>v.<br><br>UBS BANK USA,<br><br>          Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:08-CV-0960-CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

This action stems from a dispute over whether UBS Bank USA (the "Bank") provided a $4 million extension of a line of credit to Mr. Michael McGraw, with the agreement that a prepayment of the debt would trigger a breakage cost. Both parties argue that the terms of the contract are clear and unambiguous and have moved the court for summary judgment on Mr. McGraw's breach of contract cause of action. Construing the undisputed facts in the light most favorable to the Bank, the court grants Mr. McGraw's motion for summary judgment. The Bank's motion for summary judgment is denied.

## FACTUAL BACKGROUND

The relevant facts necessary to decide these motions are few and not in dispute. On December 10, 2004, Mr. McGraw signed a Credit Line Account Application and Agreement for Individuals (the "Credit Line Agreement") for $2 million with the Bank. Mr. McGraw selected a "variable credit line account," which did not carry with it a prepayment fee for "Breakage

Costs."[1]  Mr. McGraw made draws against the line of credit on which he paid interest at a variable rate.  In February 2006, the Bank extended the line of credit by an additional $4 million.  No additional agreements were signed by Mr. McGraw for the extension, but the parties proceeded under the 2004 Credit Line Agreement.  When Mr. McGraw sought to repay the loan early, the Bank asserted that the $4 million had been a fixed-interest rate advance which required payment of Breakage Costs.  On November 4, 2008, Mr. McGraw paid the last of several payments totaling $4,260,799.50 to satisfy the $4 million loan and the Breakage Costs as required by the Bank.  Mr. McGraw brings this suit to recover damages, asserting that the demand for the Breakage Costs was a breach of the loan agreement.

## DISCUSSION

### I. STANDARD FOR SUMMARY JUDGMENT

The parties' motions for summary judgment will be granted, only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Although "[t]he movant has the burden of showing that there is no genuine issue of fact," the other party "is not thereby relieved of his own burden of producing . . . evidence that would support a jury verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Likewise, the role of the Court is not to weigh the evidence, but to "determine whether there is a genuine issue for trial."  *Id*. at 249.

---

[1] It is undisputed that Breakage Costs are required to be paid on early payment of a fixed-rate loan.  *See* (Mem. Supp. Pl.'s Mot. Summ. J., Ex 1, 6.)

2

## II. ANALYSIS

The four elements of a prima facie case for breach of contract are: (1) a contract; (2) performance by the party seeking recovery; (3) breach of the contract by the other party; and (4) damages. *See Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388. There is no dispute that a contract exists, that the loan was issued by the Bank to Mr. McGraw, or that Mr. McGraw performed on the contract. The only issue before the court is whether the Credit Line Agreement required Mr. McGraw to pay Breakage Costs on early repayment of the loan. It is undisputed that the Bank required such a payment and that Mr. McGraw paid the Breakage Costs at the Bank's demand. (Compl., ¶ 27) (Dkt. No. 2). Dispositive to answering this question is whether under the Credit Line Agreement, the $4 million extension was made as a "variable rate advance" or a "fixed rate advance." For the reasons set forth hereafter, the court finds that the contract is unambiguous within its four corners, and the court is therefore not required nor allowed to resort to any extrinsic evidence. The language of the Credit Line Agreement requires the court to conclude that the $4 million loan was a variable rate advance and that the Bank was not allowed to charge Breakage Costs on Mr. McGraw's early payment.

Under Utah law, "[i]f the language within the four corners of the contract is unambiguous, then a court does not resort to extrinsic evidence of the contract's meaning, and a court determines the parties' intentions from the plain meaning of the contractual language as a matter of law." *Innerlight, Inc. v. Matrix Group, LLC*, 2009 UT 31, ¶ 14, 214 P.3d 854. The only contract before the court signed by Mr. McGraw and assented to by the Bank is the Credit Loan Agreement. In the Credit Line Agreement, Mr. McGraw was permitted to select between three options: (1) Variable Credit Line Account, (2) Fixed Credit Line Account, or (3) Both. (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 1) (Dkt. 53-1). From the face of the agreement, there is

no question that Mr. McGraw elected a variable rate line of credit. (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 1). The Bank has offered nothing that shows that Mr. McGraw agreed to open any other credit line. Furthermore, the original agreement also states that "all Advances will constitute extensions of credit pursuant to a single line of credit. The Approved Amount will be determined, and may be adjusted from time to time, by the Bank in its sole and absolute discretion." (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 7 ¶ 2(a).) In other words, once the application was accepted by the Bank, it became the credit agreement governing both the underlying loan and the future $ 4 million advance. Therefore, because the only credit line agreed to by both Mr. McGraw and the Bank was the variable credit line, and because this advance was made under the "single line of credit," any argument that the interest rate on the underlying loan or the extension was fixed is precluded.

The Bank seems to acknowledge that the initial draws against the credit line were at a variable rate. The Banks asserts, however, that the $4 million advance is supported by "a confirmation" and regularly received "loan statements" showing that the later advance was not variable, but rather a fixed-rate account. (Def.'s Mem. Supp. Mot. Summ. J., 2) (Dkt. No. 49). Specifically, the Bank first proffers a document entitled "Initial Confirmation Advance" and argues that it should have been clear to Mr. McGraw that the interest as shown on that document had been calculated at a fixed rate. *See* (Def.'s Mem. Supp. Mot. Summ. J., ¶ 10) (referencing Stewart Aff., Ex. C., 2.) (Dkt. No. 49, 50-3). This argument fails for a number of reasons. First, the Bank has failed to carefully read its own documents. By assenting to the application, the parties agreed to the terms of the attached Credit Line Agreement, including the following provision:

> Each Advance made under a Premier Credit Line will be a variable Rate Advance unless otherwise designated as a Fixed Rate Advance in an Advance Advice sent by the Bank to the Borrower. The Bank will not designate any Advance as a Fixed Rate Advance unless it has been requested to do so by the Borrower . . . .
> (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 7 ¶ 3(b).)

As defined in the Credit Line Agreement, the credit line, being for $500,000 or more, is a Premier Credit Line. (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 7) (Dkt. 53-1). And for an advance under a Premier Credit Line to be at a rate other than variable, the Bank must send an "Advance Advice." Advance Advice is defined as "written or electronic notice by the Bank, sent to the Borrower . . . confirming that a requested Advance will be a Fixed Rate Advance and specifying the amount, fixed rate of interest and interest period for the Fixed Rate Advance." (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 6 ¶ 1.)[2] The Initial Confirmation Advance the Bank relies upon fails to satisfy the requirements of this provision. *See* (Stewart Aff., Ex. C, 2). Although the Advice included a stated interest rate, it failed to designate the advance as a fixed rate advance. Nothing on the advice clearly states that the rate would not change. The Bank may not satisfy this requirement by arguing that the borrower should have been able to have determined from the Advice that the loan was being made at a fixed rate. Nothing on the document makes that change clear. Moreover, the Credit Line Agreement allows the borrower three business days to object to the fixed rate once he receives an Advice that designates the advance as being at a fixed rate. (Mem. Supp. Pl.'s Mot. Summ. J., Ex. 1, 6 ¶ 1.) Absent a clear designation, this right to object would be meaningless. To change from a variable rate to a fixed rate the Bank must clearly indicate the change and give the borrower an opportunity to object. That was not done in this case.

---

[2] This language appears to have been included to govern advances in those instances in which the borrower elected "Both" for whether the interest rate would be variable or fixed. Because Mr. McGraw did not select the "Both" option indicates that the parties had only agreed to an advance of funds at a variable rate.

In addition, the Credit Line Agreement also requires that the Bank will not designate and advance funds as a fixed rate advance unless the borrower requests it to do so. The Bank offers two exhibits to evidence Mr. McGraw's request. *See* (Stewart Aff., Ex. D, E.) (Dkt. No. 50). Both are loan statements that clearly state "Premier Fixed Credit Line" as the account type. Although this is evidence of the Bank's understanding of the agreement, it is not sufficient evidence to create a question of material fact about whether Mr. McGraw requested the fixed credit line. In any event, the Bank has failed to present evidence from which the fact finder could conclude that the Bank complied with its own requirements by sending Mr. McGraw an Advance Advice that designated the advance being made at a fixed rate.

To accept the Bank's arguments would require the court to reject the clear and unambiguous language of the contract governing the parties' rights. It is well-established that "[t]he interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent . . . is necessary to establish the terms of the contract." *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991). The contract at issue here is not ambiguous. The dealing in dispute between the Bank and Mr. McGraw is provided for in the Credit Line Agreement and the Bank has cannot point to any other superseding contract that controls the distribution or repayment of the additional funds. As such, the extrinsic course of conduct evidence embodied in the loan statements is not permitted to create a material question of fact. *See Wood v. Utah Farm Bureau Insurance Co.*, 2001 UT App. 35 ¶ 9, 19 P.3d 392 (stating, "[b]ecause the Contract unambiguously gives [the defendant ownership of the disputed items], the extrinsic course of conduct does not create a material question of fact"). The court therefore finds that the $4 million was extended by the Bank under the terms of the original

agreement, which agreement unambiguously created a variable credit line account free of any prepayment penalty.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for Summary Judgment on his <u>First Cause of Action, Breach of Loan Agreement – UBS Bank USA</u> is GRANTED. The court declines to order damages and costs until (1) the <u>Second Cause of Action, Breach of Fiduciary Duty – UBS Financial Services Inc. and John Belford</u> is resolved or voluntarily dismissed, and (2) the court receives a stipulated agreement on the matter or additional briefing from the parties.

DATED this 1st day of February, 2011.

BY THE COURT:

_____

Clark Waddoups

United States District Judge